# Exhibit 1

| | |
|---|---|
| IN THE MATTER OF THE ARBITRATION UNDER THE 2013 UNCITRAL ARBITRATION RULES BETWEEN | ) ) ) ) ) |
| Hogan Lovells US LLP | ) ) |
| Claimant, | ) ) |
| against | ) ) |
| Islamic Republic of Afghanistan and Islamic Emirate of Afghanistan, as successor in interest | ) ) ) ) |
| Respondent(s). | ) ) |

**FINAL AWARD**

December 22, 2022

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................3

II.    PARTIES ............................................................................................4

     i.    Claimant ..................................................................................4

     ii.   Respondent(s) ..........................................................................4

III.   ARBITRATION AGREEMENT AND APPLICABLE LAW....................5

IV.   PROCEDURAL HISTORY AND PRIOR PROCEDURAL ORDERS.............6

V.    FACTUAL FINDINGS .......................................................................8

VI.   CLAIMANT'S POSITION AND REQUESTED RELIEF ........................16

     i.    Claimant's Claims ..................................................................16

     ii.   Relief Sought .........................................................................19

VII.  THE TRIBUNAL'S ANALYSIS .........................................................20

     i.    Jurisdiction ............................................................................20

     ii.   Sovereign Immunity................................................................21

          (1)   FSIA .............................................................................21

          (2)   International Law ..........................................................23

          (3)   Analysis........................................................................23

     iii.  The Republic's Breach of Contract........................................24

          (1)   Claimant's legal fees ....................................................24

          (2)   Claimant's disbursements ............................................25

     iv.  Unjust Enrichment .................................................................26

     v.    The Emirate's Liability for the Republic's Breach of Contract................27

     vi.  Pre- and Post-Award Interest ..................................................30

     vii. Costs....................................................................................31

VIII. THE TRIBUNAL'S DECISION AND RELIEF AWARDED.........................32

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement contained in Article 14 of the General Terms of Representation attached to Claimant Hogan Lovells US LLP ("**Hogan Lovells**", or "**Claimant**")'s engagement letter dated November 12, 2018, signed and entered into with Respondent(s) Islamic Republic of Afghanistan and Islamic Emirate of Afghanistan, as successor in interest ("**Afghanistan**", or "**Respondent(s)**"; Claimant and Respondent(s) together hereinafter the "**Parties**"), acting through its then Ministry of Finance of the Government of the Islamic Republic of Afghanistan and Ministry of Mines and Petroleum of the Government of the Islamic Republic of Afghanistan[1] and discussed in more detail in this Final Award, and having duly heard the proofs and allegations of the Parties, FIND and issue this FINAL AWARD in Washington, DC as follows:

## I.    INTRODUCTION

1.  Claimant brought this arbitration for payment of legal fees against Afghanistan for legal services rendered to the Republic under an engagement letter that does not choose the applicable law.

2.  Duly notified, properly served and on notice through electronic communication to the appropriate email address published on the Emirate's Ministry of Finance's public and regularly updated website, Respondent(s) failed to appear in this arbitration.

3.  While some payments had been made by the Republic for the services rendered by Claimant, on August 15, 2021, the open balance amounted to $1,178,933.23 and the Taliban entered Kabul, eventually establishing a new government, naming the country of Afghanistan the Emirate.  Neither the Republic prior to August 15, 2021, nor the Emirate thereafter, made payment in full.

4.  Claimant seeks an award for $1,178,933.23 against both the Republic and the Emirate based on breach of contract and for an additional $48,412.87 based on both breach of contract and unjust enrichment theories for services provided and to be paid to local counsel in Afghanistan, together with costs and interest.

---

[1] C-2, Hogan Lovells Engagement Letter, signed January 2019 (hereinafter the "**Engagement Letter**").

## II.    PARTIES

### i.    *Claimant*

5.  Claimant Hogan Lovells US LLP ("**Claimant**" or "**Hogan Lovells**") is a limited liability partnership registered in Washington, D.C., constituting a part of an international law firm with headquarters in Washington, D.C. and London.

6.  Hogan Lovells' contact information is as follows:

> Hogan Lovells US LLP
> 555 Thirteenth Street, NW
> Washington, D.C. 20004

7.  Claimant is represented in these proceedings by:

> Dennis H. Tracey, III, Esq.
> Irina Goga, Esq.
> Hogan Lovells US LLP
> 390 Madison Avenue
> New York, NY 10017
> Tel: +1 (212) 918-3000
> Fax: +1 (212) 918-3100
> dennis.tracey@hoganlovells.com
> irina.goga@hoganlovells.com

### ii.    *Respondent(s)*

8.  Claimant's claims are brought against what it describes as the true obligor, "the country of Afghanistan", a sovereign state, and named as Respondent(s) The Islamic Republic of Afghanistan (the "**Republic**") and The Islamic Emirate of Afghanistan, as successor in interest (the "**Emirate**").  According to Claimant, "Respondent the Republic is the former governing entity for the state of Afghanistan.  From approximately December 2001 to August 2021, the Republic was the recognized and legitimate government for Afghanistan. On August 15, 2021, the Republic ceded the capital of Afghanistan, Kabul, to the Emirate, which has now succeeded the Republic as the governing body of Afghanistan.  As the government of Afghanistan, the Emirate is the successor to the Republic and has thus inherited the Republic's liabilities and assets."[2] At the hearing on the merits, counsel for the Claimant explained: "The practical issue in terms of just naming respondents is that the

---

[2] Statement of Claim dated June 1, 2022 ("**SoC**"), ¶ 6.

government has the right to name the country … we used the names of the government, the names of the country that were created by the government that controlled it during those periods."[3]

9. Respondent(s) did not appear in these proceedings.  All notices from Claimant and the Tribunal were served upon:

> Wali Haqmal
> Ministry of Finance
> Government of Afghanistan
> Pashtunistan Watt
> Kabul, Islamic Emirate of Afghanistan
> Wali.haqmal@mof.gov.af[4]

10. In addition, Claimant and the Tribunal sent communication pertaining to this arbitration to the following email address: iprd@ago.gov.af

## III.    ARBITRATION AGREEMENT AND APPLICABLE LAW

11. The arbitration agreement invoked by Claimant is contained in Article 14 of the General Terms of Representation of the Engagement Letter, which provides, in its entirety, as follows:

> 14. Arbitration of Disputes
>
> The parties agree to final binding arbitration regarding any disputes or claims of any type or nature with respect to services rendered pursuant to this engagement letter, including, without limitation, disputes or claims related to legal fees for such services. The parties recognize that, by agreeing to arbitration, they will be waiving any right to a jury trial as well as the extensive discovery rights and strict evidentiary rules typically permitted in judicial proceedings. While arbitration might result in cost and time savings, the parties recognize that they will be waiving their right to a judicial appeal. Unless otherwise agreed to by the parties or required by applicable jurisdictional requirements, the UNCITRAL Arbitration Rules shall govern the arbitration, the American Arbitration Association shall be the appointing authority, and the number of arbitrators shall be one.

12. The Engagement Letter does not contain any agreement on the applicable law.

---

[3] See Hearing Transcript, Day 2, at 151:3-6 and 151:18-21.

[4] See infra, ¶ 22.  The Tribunal maintained a file of delivery confirmations for each of its communication to the above-stated email address.

## IV.    PROCEDURAL HISTORY AND PRIOR PROCEDURAL ORDERS

13. The procedural history is set out in the Tribunal's Procedural Orders Nos. 1 through 4 (dated March 17, 2022, April 26, 2022, October 12, 2022, and October 28, 2022), the contents of which are restated herein by reference thereto and the findings and directions therein are hereby confirmed and adopted in this Final Award.  In relevant part, the procedural history is summarized as follows:

14. Pursuant to Article 3 of the 2013 Arbitration Rules of the United Nations Commission on International Trade Law ("**UNCITRAL Rules**"), Claimant initiated arbitration on November 30, 2021 by sending the Notice of Arbitration together with its exhibits A – N to Respondent(s) at wali.haqmal@mof.gov.af.

15. On December 6, 2021, the American Arbitration Association ("**AAA**") received Claimant's Notice of Arbitration dated November 30, 2021, and a request for the appointment of a sole arbitrator in this matter.  The AAA confirmed that it would be producing a list of five prospective arbitrators to serve as sole arbitrator under the UNCITRAL Rules.  The AAA also requested that the parties submit any comments they may have regarding the qualifications of the sole arbitrator and provide a checklist for conflicts for the prospective arbitrators.

16. On December 16, 2021, Claimant requested that the sole arbitrator "be a practicing lawyer".

17. On January 6, 2022, Claimant sent the Notice of Arbitration to Respondent(s) at iprd@ago.gov.af.

18. On January 14, 2022, the AAA appointed Mr. Martin F. Gusy as Sole Arbitrator.  The AAA also requested the parties to file any objections to such appointment by January 24, 2022.

19. On January 27, 2022, the AAA confirmed the undersigned's appointment as Sole Arbitrator, noting that no objections were received in response to such appointment. Subsequently, the Tribunal issued its Terms of Engagement, including the Tribunal's assistance by Administrative Secretaries Jadranka Jakovcic and Camille Ng.

20. On March 1, 2022, the Tribunal held an in-person preliminary conference. No representatives on behalf of Respondent(s) attended the conference.

21. On March 2, 2022, Claimant re-sent its Notice of Arbitration in hardcopy via FedEx to Respondent(s) at the above stated address.

22. Following the preliminary conference, on March 17, 2022, the Tribunal issued Procedural Order No. 1, providing, *inter alia*, that the language of arbitration be English, that the place of arbitration be Washington, D.C., electronic service upon Respondent(s) at wali.haqmal@mof.gov.af the publicly stated press contact on the regularly updated website of the Emirate's Ministry of Finance is sufficient per Article 2(2) of the UNCITRAL Rules, and set a briefing schedule following which a hearing on the merits was to be held in Washington, D.C. in the week of October 24-28, 2022.[5]

23. Per Procedural Order No. 1, Respondent(s) were to submit the Response to the Notice of Arbitration on or before April 18, 2022. The Tribunal did not receive any Response to the Notice of Arbitration.

24. On April 26, 2022, the Tribunal issued Procedural Order No. 2 providing, *inter alia*, the details and arrangements made for the upcoming hearing at Planet Depos, 1100 Connecticut Ave NW, Suite 950, Washington, D.C., 20036, USA.

25. Pursuant to Procedural Order No. 1, on June 1, 2022, Claimant filed its Statement of Claim, accompanied by factual exhibits C-1 through C-26, legal authorities CLA-1 through CLA-15, and the witness statements of Bruce Gilchrist signed and dated June 1, 2022, Kabir Khan Isakhel signed and dated June 1, 2022, and Dennis H. Tracey, III signed and dated June 1, 2022. Claimant served its Statement of Claim upon Respondent(s) via electronic service to wali.haqal@mof.gov.af.

26. Per Procedural Order No. 1, Respondent(s) were to submit the Statement of Defense on or before September 1, 2022. The Tribunal did not receive any Statement of Defense to date.

---

[5] In relevant part, Procedural Order No. 1 states: "In view of Claimant's provision of and the Sole Arbitrator's consideration of evidence relating to the email address of the Ministry of Finance of the Islamic Emirate of Afghanistan at wali.haqmal@mof.gov.af, as received on March 3, 2022 [...], the Sole Arbitrator authorizes electronic delivery of all notices to Respondent at the email address wali.haqmal@mof.gov.af."

27. On October 11, 2022, the Tribunal held a status conference via videolink.  Only Claimant appeared.

28. Following the status conference, on October 12, 2022, the Tribunal issued Procedural Order No. 3 providing, *inter alia*, an order of continuance of this Arbitration per Article 30(1)(b) of the UNCITRAL Rules, and further details on the hearing arrangements.

29. On October 25-26, 2022, the Tribunal held an in-person hearing on the merits in Washington, D.C.  At the hearing, a transcript was taken and Claimant submitted and the Tribunal accepted into the record of this case CLA-16 and CLA-17.

30. On October 28, 2022, the Tribunal issued Procedural Order No. 4 setting a briefing schedule for the remaining submission on costs and interests and announced its intent to declare the hearings closed shortly after receipt of the Parties' submissions on costs and interest.

31. On November 29, 2022, per Procedural Order No. 4, Claimant filed its Submission on Costs and Interest accompanied by factual exhibits C-27 through C-28 and legal authorities CLA-18 through CLA-21.  Claimant served its Submission on Costs and Interest upon Respondent(s) via electronic service to wali.haqal@mof.gov.af.

32. Per Procedural Order No. 4, on or before December 13, 2022, Respondent(s) were to submit the Response to Claimant's Submission on Costs and Interests.  The Tribunal did not receive any Response to Claimant's Submission on Costs and Interests.

33. On December 20, 2022, Claimant submitted an updated factual exhibit C-27. Respondent(s) were afforded an opportunity for comment, but the Tribunal did not receive any submission from the Respondent(s).

34. On December 21, 2022, the Tribunal declared the hearings closed per Article 31(1) of the UNCITRAL Rules.

## V.    FACTUAL FINDINGS

35. Respondent(s) has/have "refused to appear in this arbitration despite the fact that it was properly notified of this arbitration.  All filings and correspondence in this arbitration were electronically served to the appropriate email address of the Ministry of Finance.  This

email address is published on the Ministry of Finance's public website, which is regularly updated."[6]  Claimant's account of the underlying facts, as summarized in the following, is both unopposed and proven by Claimant's submissions to date and the evidence presented at the hearing on the merits.  As such, the following factual background constitute factual findings of this Tribunal.

36. Claimant began providing pro bono legal services for Respondent(s) in 2015.  As Respondent(s) wanted to engage Claimant on larger scale matters, all of which became the subject of this arbitration, the Parties started working on an engagement letter in 2018.[7]

37. Bruce Gilchrist ("**Mr. Gilchrist**"), a partner in the Washington, D.C. office of Hogan Lovells US LLP, met with Respondent(s)' representatives in Dubai and, on October 12, 2018, sent a draft engagement letter addressed to the Ministry of Finance ("**MOF**") and the Ministry of Mines and Petroleum ("**MoMP**") to Nargis Nehan ("**Minister Nehan**"), the Interim Minister of Mines and Petroleum, and Yama Nezam ("**Mr. Nezam**"), an aid to Minister of Finance Mohammad Qayoumi ("**Minister Qayoumi**").  In his cover note, Mr. Gilchrist pointed out that the engagement letter "contemplates that the Ministries may ask [Hogan Lovells] to advise them on other matters in the future."[8]

38. The Parties agreed to a fee billing arrangement, agreeing that "Hogan Lovells would bill 50% of its time to the Republic and consider the other 50% as pro bono."[9]

39. Following the Republic having engaged Hogan Lovells on two new matters, Mr. Gilchrist sent the Republic an updated engagement letter on November 12, 2018,[10] and indicated that new matters can be "added with an exchange of emails as we may mutually agree."[11]

---

[6] Claimant's Submission on Costs and Interest, ¶ 11.

[7] Witness Statement of Bruce Gilchrist, ¶¶ 4-6.

[8] SoC, ¶ 11; C-01, Email correspondence from Yama Nezam to Bruce Gilchrist, "Hogan Lovells Engagement for Billable Matters," dated January 8, 2019; Witness Statement of Bruce Gilchrist, ¶ 5.

[9] Witness Statement of Bruce Gilchrist, ¶ 4.

[10] SoC, ¶ 11; C-01, Email correspondence from Yama Nezam to Bruce Gilchrist, "Hogan Lovells Engagement for Billable Matters," dated January 8, 2019; Witness Statement of Bruce Gilchrist, ¶ 5.

[11] Id.

40. The updated November 12, 2018 engagement letter was approved by Respondent(s)' National Procurement Council (NPC) on January 7, 2019 and subsequently signed by Respondent(s)' then Minister Qayoumi and Minister Nehan.[12]

41. Subsequently, the Republic requested that Claimant take on new matters as they arose, typically through email communications, but also at in-person meetings between Mr. Nezam and various partners at Hogan Lovells, or via phone calls.[13]  Work on the new matters was performed under the terms of the Engagement Letter.[14]

42. In late 2019, Hogan Lovells was engaged to handle "a litigation brought against the Republic pending in the United States District Court for the Southern District of New York by a victim of the September 11 attacks."  Mr. Dennis Tracey ("**Mr. Tracey**"), based in Claimant's New York office, became the partner in charge of this matter.[15]

43. In or about April 2020, Hogan Lovells' main point of contact within the Republic became Mr. Kabir Isakhel ("**Mr. Isakhel**"),[16]  who was the Chief Legal Advisor to the President of the Republic and the Director General of the National Procurement Authority.[17]  Upon Mr. Nezam's departure from the government, Mr. Isakhel "assumed primary responsibility for overseeing the work of Hogan Lovells and engaging Hogan Lovells for new matters."[18]

---

[12] C-02, Hogan Lovells Engagement Letter, signed January 2019; SoC, ¶ 12; C-01, Email correspondence from Yama Nezam to Bruce Gilchrist, "Hogan Lovells Engagement for Billable Matters," dated January 8, 2019; Witness Statement of Bruce Gilchrist, ¶ 6.

[13] See, e.g., C-03, Email correspondence from Yama Nezam dated March 20, 2019; see also, C-04, Email correspondence from Dennis Tracey to Bruce Gilchrist and Scot Anderson, "New Engagement," dated June 14, 2020; see also, C-05, Email correspondence from Scot Anderson to Aaron O'Connell, Joseph Bell, Bruce Gilchrist, and Julia LaManna, "Travertine RfP, with attachment Request for Proposal for Ghazni Travertine," dated December 11, 2018; see also, C-06, Email correspondence from Yama Nezam to Director General Miakhail, "Radio Tv Afghanistan to Corporation Status," dated June 9, 2019; see also, C-07, Email correspondence from Nekmatullah Khostwal to Markley Schlegal, "DABS 4 ppp Projects, Bayat Power PPA and Uzbez Afghan PPSA," dated July 29, 2020; Witness Statement of Bruce Gilchrist, ¶ 7.

[14] Witness Statement of Bruce Gilchrist, ¶ 8.

[15] Witness Statement of Dennis Tracey, ¶¶ 4, 6.

[16] Witness Statement of Dennis Tracey, ¶ 5.

[17] Witness Statement of Kabir Isakhel, ¶¶ 2-3.

[18] Witness Statement of Dennis Tracey, ¶ 5.

Mr. Isakhel would communicate with Hogan Lovells partners regarding the new matters intake via WhatsApp messages, phone calls, or emails.[19]

44. On or about October 6, 2020, the Republic transferred all matters handled by another firm to Hogan Lovells, from which point the majority of legal services provided for the Republic were overseen by Mr. Tracey and performed from Claimant's New York office.[20]

45. Mr. Isakhel recommended that Hogan Lovells engage local counsel for help with Afghan law and to meet with government officials in Kabul as needed.[21] Mr. Isakhel recommended, inter alia, Afghan Knowledge Solutions ("**AKS**"), which Hogan Lovells eventually engaged as local counsel.[22] Claimant entered into a Cooperation Agreement with AKS on January 5, 2021.[23] In the Cooperation Agreement, AKS agreed to provide "legal advice and other support services as requested by [Hogan Lovells]".[24] In August 2021, Claimant received invoices for services rendered by AKS until that date.[25] Those invoices were not passed along to Afghanistan prior to the Statement of Claim in this Arbitration, and they "remain outstanding in the amount of $48,412.87."[26] AKS has not pursued any activity against Hogan Lovells.[27]

46. The Republic made the following payments for legal services rendered by Hogan Lovells:[28]

     a.     two payments totaling $522,413.14;[29]

---

[19] Witness Statement of Dennis Tracey, ¶ 5; C-16, Email correspondence from Kabir Isakhel to Dennis Tracey, "PPP Projects for HEC Approval," dated July 5, 2020.

[20] Witness Statement of Dennis Tracey, ¶ 7.

[21] Witness Statement of Dennis Tracey, ¶ 10; Witness Statement of Kabir Isakhel, ¶ 7.

[22] Witness Statement of Dennis Tracey, ¶ 11; Witness Statement of Kabir Isakhel, ¶ 7.

[23] C-19, Cooperation Agreement between Hogan Lovells and Afghan Knowledge Solutions, dated January 5, 2021; Witness Statement of Dennis Tracey, ¶ 12.

[24] Witness Statement of Dennis Tracey, ¶ 12.

[25] Witness Statement of Dennis Tracey, ¶ 12.

[26] Witness Statement of Dennis Tracey, ¶ 12; C-20, Afghan Knowledge Solution invoices to Hogan Lovells, dated February 28, 2021 through June 30, 2021.

[27] Hearing Transcript Day 1, 120:22 – 121:3.

[28] Witness Statement of Bruce Gilchrist, ¶ 9.

[29] C-11, Email correspondence from Abdul Wahed Jaihon to Bruce Gilchrist, "Ministry of Finance/Government of Afghanistan -- HL Invoices Payment Received," dated May 19, 2020.

b.       payment in the amount of $231,509.99 (in April 2019);[30]

c.       payment in the amount of $136,105.01 (in October 2019);[31] and

d.       payment in the amount of $158,139.06 (in December 2019).[32]

47. The total amount paid by the Republic to Hogan Lovells, for legal services provided under the Engagement Letter, is $1,048,067.20.[33] Respondent(s) has/have not made any additional payments after December 2019.[34]

48. Claimant "ceased representing the Republic—and the state of Afghanistan—and, as of November 10, 2021, has withdrawn from all matters in which the firm had entered an appearance."[35]

49. By the end of Claimant's representation of Respondent(s), Claimant had invoiced Respondent(s) with open balances on a total of 17 matters.[36] The outstanding amount invoiced by Hogan Lovells is $1,178,933.23, without the tax gross up of roughly 7.52% of the services rendered.[37] The underlying invoices submitted as Exhibit B-N of the Notice of Arbitration, dated November 30, 2021, are summarized in the table below:[38]

---

[30] C-08, Email correspondence from Rosamond Zamore to Bruce Gilchrist, "Unallocated amount for GOVERNMENT OF AFGHANISTAN Client matter 755044.001," dated April 24, 2019.

[31] C-09, Wire Transfer Detail Transfer Report, dated October 19, 2019.

[32] C-10, Email correspondence from Rosamond Zamore to Sandra Hall and Bruce Gilchrist, "Payment Sent by Ministry of Finance/Government of Afghanistan (755044)," dated December 9, 2019.

[33] Witness Statement of Bruce Gilchrist, ¶ 9; Witness Statement of Dennis Tracey, ¶ 8.

[34] SoC, ¶ 22. Witness Statement of Dennis Tracey, ¶ 15.

[35] Notice of Arbitration, ¶ 24.

[36] C-26, Summary of Invoices and Payments; see also, Exhibit B-N of the Notice of Arbitration, dated November 30, 2021.

[37] SoC, ¶ 22; Notice of Arbitration, ¶ 21.

[38] C-26, Summary of Invoices and Payments.

| Matter Number | Attorney's Fees | Disbursements | Tax Gross Up | Amount Invoiced | Amount Received | Write-offs | Amount Still Owed |
|---|---|---|---|---|---|---|---|
| 755044.000001 | 562,120.12 | 43,569.97 | 10,854.52 | 616,544.61 | 540,251.43 | 16,932.66 | 48,506.00 |
| 755044.000002 | 65,037.25 | 1,558.16 | 1,647.07 | 68,242.48 | 63,263.34 | 3,332.07 | |
| 755044.000003 | 311,127.75 | 661.33 | 20,308.17 | 332,097.25 | 209,283.86 | 3,085.47 | 99,419.75 |
| 755044.000004 | 17,426.75 | | 243.92 | 17,670.67 | 16,380.72 | 1,046.03 | |
| 755044.000005 | 89,793.50 | | 6,285.55 | 96,079.05 | 89,793.50 | | |
| 755044.000006 | 116,982.75 | 53.04 | 8,416.18 | 125,451.97 | 82,782.84 | 365.45 | 33,887.50 |
| 755044.000007 | 3,673.25 | | 257.13 | 3,930.38 | 3,673.25 | 0.00 | |
| 755044.000008 | 114,057.75 | 6.25 | 8,585.47 | 122,649.47 | 42,638.26 | | 71,425.74 |
| 755044.000009 | 1,380.50 | | 103.90 | 1,484.40 | | | 1,380.50 |
| 755044.000010 | 204,811.62 | 54,037.59 | 19,483.26 | 278,332.47 | | | 258,849.21 |
| 755044.000011 | 68,589.25 | | 5,162.64 | 73,751.89 | | | 68,589.25 |
| 755044.000012 | 8,800.00 | | 662.37 | 9,462.37 | | | 8,800.00 |
| 755044.000014 | 245,287.00 | 9,676.53 | 19,190.82 | 274,154.35 | | | 254,963.53 |
| 755044.000015 | 254,902.25 | 198.73 | 19,201.17 | 274,302.15 | | | 255,100.98 |
| 755044.000016 | 66,159.49 | | 4,979.74 | 71,139.23 | | | 66,159.49 |
| 755044.000017 | 11,744.25 | 107.03 | 892.03 | 12,743.31 | | | 11,851.28 |
| TOTAL | | | | | 1,048,067.20 | | 1,178,933.23 |

50. According to Mr. Isakhel, the Chief Legal Advisor to His Excellency, the President of the Islamic Republic of Afghanistan, Mohammad Ashraf Ghani, "I have reviewed the list of matters in the various invoices, statements of account, and the summary chart presented as Exhibits B through N to the Request for Arbitration. Hogan Lovells was engaged to provide legal services related to all of these matters and did provide legal services related to all of these matters. I was fully satisfied with the work performed by Hogan Lovells. Hogan Lovells fully performed its obligations under the Engagement Letter."[39] At the hearing on the merits, Mr. Isakhel testified as follows: "What I want to emphasize, that the work that was conducted by Hogan Lovells, I read every single statement and I went through every single thing. It's very sad that they have not been paid. And perhaps had I been in the office is a professional embarrassment for the delays in payment. ... the contract was the letter of engagement from 2019, and that was shared with the president and actually the forces there and with myself for the instructions I received, how we wanted to engage them. … The work, we were very satisfied. They very well understood the policy direction of the president. … Most of the dealings were going in line with our key priority, our strategy. And they perfectly understood it. … [t]hey represented us with the highest integrity."[40]

---

[39] Witness Statement of Kabir Isakhel, ¶ 8.

[40] Hearing Transcript Day 1, 74:5-11, 75:5-9, 78: 5-7, 78:10-12, 78:16-17.

51. Claimant's relationship partner, Mr. Gilchrist testified in response to the Tribunal's question: "Q: [T]his was nothing but a successful completion of the task that Hogan Lovells was expected to complete. Is that a fair description? A: That's what we think we did, and that's what our client led us to believe we did. They kept coming back asking us to do more."[41]

52. On August 13, 2021, a director of a claimant in an arbitration that had been brought against the Ministry of Energy and Water of the Islamic Republic of Afghanistan addressed the sole arbitrator in that matter as follows: "[T]he Claimant assumes that the Sole Arbitrator is aware of the recent development inside Afghanistan as it makes headlines on all major news outlets. As of today, the Government controls only 20% of Afghanistan … and US intelligence reported earlier this week that Kabul will fall within 30 to 90 days maximum".[42]

53. Mr. Isakhel, then Chief Legal Advisor to the President was supposed to head a delegation to Turkey to open a trade and transit corridor and leave on that assignment with the instruction of the President on the evening of August 14, "and then things took a different turn and the situation was not very well. … I left on the evening of the 14[th] of August and the government fell and the Taliban took control on the 15[th]."[43]

54. On August 15, 2021, Taliban forces entered Kabul, the capital of the Republic. Around that time, President Mohammad Ashraf Ghani left Afghanistan in order to prevent further bloodshed in Kabul. Eventually, the Taliban established a government, the Islamic Emirate of Afghanistan, which is the government of Afghanistan today.[44]

55. Mr. Tracey testified: "We continued to do our work, and it was business as normal until August 15 until I woke up on a Saturday morning and I heard that Kabul had fallen, that the Taliban had walked in, that the existing government had, if not handed over the reins, had allowed them to take over the reins. And Ashraf Ghani had left the country. And so

---

[41] Hearing Transcript Day 1, 89:2-7.

[42] See C-24, Email correspondence from Dennis Tracey to Energy Services Regulatory Authority of Afghanistan.

[43] Hearing Transcript Day 1, 48:8-14.

[44] Witness Statement of Kabir Isakhel, ¶ 11.

we were in a situation at that point where as a matter of fact the government had fallen to the Taliban.  Our client, the Islamic Republic, was no longer in charge."[45]

56. On August 25, 2021, with respect to the arbitration against the Ministry of Energy and Water of the Islamic Republic of Afghanistan, Mr. Tracey sent an email to the persons then instructing him for the Respondent(s) as follows: "Given the change of government in Afghanistan, we take this opportunity to remind you once again to retain all documents… We further request that, given the change of government, you advise us as soon as possible (1) whether you will continue to be responsible for the … arbitrations; and if not; (2) whether you can identify who will be responsible for them going forward."[46]

57. Mr. Tracey followed up on September 8, 2021: "Having received no reply to our prior communication, we wish to request once again your instructions for the future handling of this matter.  We have read in news reports that certain ministers have been appointed yesterday in a new government.  Please advice whether you will continue to be responsible for this matter or, if not, whether you can identify the person or persons from the new government who will be responsible."[47]

58. Similarly, in another arbitration matter handled by Hogan Lovells for the named respondents Afghanistan Civil Aviation Authority, Afghanistan Ministry of Transportation and Civil Aviation, and Ariana Afghan Airlines Co. Ltd., counsel for the adversary wrote on August 24, 2021: "Whist the Claimants are sympathetic to the difficulties raised by Hogan Lovells, the Claimants also have serious concerns regarding the risk of spoliation of evidence relevant to this case in the event of a stay, which will inevitably increase with the passage of time.  The Claimants would accordingly be willing to consent to a shorter stay of 30 days, subject to clarification from Hogan Lovells as to what steps it has taken to preserve documentary evidence in the hands of the former government and relevant custodians within the Respondents.  … We understand that Hogan Lovells remains in contact with officials at the ACAA who may be continuing in office under the new regime, and we would invite Hogan Lovells to clarify the steps taken to notify the new government

---

[45] Hearing Transcript Day 1, 105:19-106:7.

[46] See C-24, Email correspondence from Dennis Tracey to Energy Services Regulatory Authority of Afghanistan.

[47] See C-24, Email correspondence from Dennis Tracey to Energy Services Regulatory Authority of Afghanistan.

of these proceedings." Hogan Lovells followed up, in relevant part, informing on September 8, 2021 that "[i]t was announced today … that the Taliban has formed an interim government. It is our understanding that, as part of this change, new individuals have been appointed to head various bodies within the government. Amongst these is a new Director General of the Afghanistan Civil Aviation Authority." And on September 15, 2021, Hogan Lovells followed up as follows: "[G]iven the continued uncertainty in Afghanistan, the change in government, and the lack of instruction from the new government, Hogan Lovells will resign from its representation."[48]

59. The territory of the state of Afghanistan, that is a United Nations member state, has not changed as a result of the events in August 2021. The same six neighboring countries continue to be Iran, Turkmenistan, Uzbekistan, Tajikistan, China and Pakistan.[49] The international community has not recognized the Emirate, the government eventually formed by the Taliban.[50]

## VI.    CLAIMANT'S POSITION AND REQUESTED RELIEF

> i.    *Claimant's Claims*

60. It is Claimant's position that the Respondent(s) cannot invoke sovereign immunity, neither from arbitration, nor from liability.[51]

61. Whether under New York or Washington D.C. laws, Claimant alleges that Respondent(s) has/have breached Article 7 of the Engagement Letter's General Terms of Representation by failing to pay outstanding invoices for the legal services provided under the Engagement Letter,[52] thus causing damages to the Claimant in the amount of $1,178,933.23.[53] The provision of Article 7 states, in full:

---

[48] See C-23, Email correspondence from Michael Taylor to ICC Tribunal.

[49] See Hearing Transcript Day 1, 71:15-72:4.

[50] See Hearing Transcript Day 2, 140:16.

[51] SoC, ¶¶ 27 et seq.

[52] Witness Statement of Bruce Gilchrist, ¶ 10; Witness Statement of Dennis Tracey, ¶ 9; Exhibit B-N of the Notice of Arbitration, dated November 30, 2021.

[53] SoC, ¶ 46.

We will bill you monthly for legal services and other charges (listed on the attached schedule). Payment will be due within 30 days of the date of our statement. If bills are not timely paid, the Firm may cease work and withdraw from the representation to the extent permitted by applicable Rules of Professional Conduct. If major third-party charges are incurred in connection with the representation, such as printing bills, filing fees, court reporting fees, and consultant or expert witness fees, our normal practice is to forward such statements directly to you for payment.

Our fees are determined net of any withholdings, deductions or payments that you or we may be required to make in respect of any taxes or duties, including, without limitation, taxes in the nature of "value added taxes," sales taxes, or taxes imposed upon gross receipts that we might be required to pay (but excluding taxes payable by us with respect to our net income by reason of our having an office in the jurisdiction imposing the tax). If you or we are required by law to withhold, deduct or pay taxes or other amounts (other than taxes on our net income as described in the parenthetical in the preceding sentence), then the amount of each bill shall be treated as increased to the extent necessary that, after any withholding, deduction or payment, we will receive and retain a net sum equal to the amount of the bill, unless we have taken into account the withholding, deduction or payment in determining the amount of the bill.

Our representation will be deemed concluded at the time that we have rendered our final bill for services on this and any other matter undertaken for you.

62. While the Engagement Letter explicitly covered legal services provided to MOF and MoMP, where other agencies of the Republic contacted Claimant seeking legal advice,[54] it is Claimant's position that engagements by other organs of Respondent(s) were those contemplated by the following language in the Engagement Letter: "You and we may agree to handle other matters under this agreement in the future, by exchange of emails or other communication."[55] As such, the additional agreements of representation reached, according to Claimant, constituted an amendment to Article 3 of the General Terms of Representation expanding the scope of the Engagement Letter to those additional matters as well.[56]

---

[54] See, e.g. C-07, Email correspondence from Nekmatullah Khostwal to Markley Schlegal, "DABS 4 ppp Projects, Bayat Power PPA and Uzbez Afghan PPSA," dated July 29, 2020.

[55] C-02, Hogan Lovells Engagement Letter, signed January 2019.

[56] C-02, Hogan Lovells Engagement Letter, signed January 2019, Article 3 of the Engagement Letter General Terms of Representation states, in relevant part: "3. Client Identification.  We can only represent clients that have been

63. Additionally, Claimant contends that Respondent(s) breached the above quoted Article 7 of the Engagement Letter's General Terms of Representation by failing to pay for third-party disbursements,[57] namely the AKS invoices associated with Claimant's representation ("…If major third-party charges are incurred in connection with the representation, such as printing bills, filing fees, court reporting fees, and consultant or expert witness fees, our normal practice is to forward such statements directly to you for payment…").[58]   It is Claimant's position that payment of AKS's invoices by Hogan Lovells is agreed upon in Article 4 of the Cooperation Agreement, which reads, in full:

> AKS shall submit monthly invoices to HL, whereupon HL may review the invoices for accuracy. At such times as HL submits its own periodic invoices to its client(s) under the Engagement Letter, it shall include the pending AK.S invoices and AK.S consents to the disclosure of its invoices to the relevant HL client in connection therewith. AK.S acknowledges that invoices submitted by it hereunder will be paid by HL from funds received from the relevant HL client under the Engagement Letter (which funds received will be net of any applicable withholding tax) and that HL is not independently guaranteeing payment of such invoices nor is it responsible for its payment until HL receives payment of amounts invoiced by AKS from its client. Subject to the foregoing, HL agrees to make payment to AKS promptly after receiving payment from its relevant client of the full amount of any AKS fees and expenses that were billed by HL for AK.S's work and collected by HL. AKS acknowledges and agrees that it will be entitled to payment only after payment by the relevant HL client to HL in respect of the submitted AKS invoices, and that it will not have any recourse against HL except to the extent of its share of payments actually made by the relevant HL client to HL in respect of AK.S's invoices.

64. Claimant's alleged damages arising from that breach are $48,412.87, which is the total amount of outstanding AKS invoices.

65. Additionally, Claimant alleges that Respondent(s) has/have been unjustly enriched by failing to pay the outstanding invoices for the services rendered by the local counsel, AKS,

---

cleared through a conflicts check and whose names appear in our conflicts database.  You agree that the Ministries named in the Transmittal Letter are our clients for the specific matters on which we are engaged…"

[57] See Hearing Transcript Day 1, 120:9 – 121-14.

[58] C-02, Hogan Lovells Engagement Letter, signed January 2019; SoC, ¶ 47.

pursuant to the Cooperation Agreement entered into between Claimant and AKS on January 5, 2021, in the amount of $48,412.87.[59]

66. It is Claimant's position that both the Republic and the Emirate, are liable for the debt incurred by the Republic. Claimant argues that its breach of contract and unjust enrichment claims are governed by either New York or Washington D.C. laws. At the hearing on the merits, Claimant argued that "the issue of succession is most likely viewed as an issue of international law" and "[c]ourts and arbitral tribunals have long recognized the general principle of international law that state obligations survive a change in government".[60]

67. Claimant's claim for fees and costs is made under Articles 40(2) and 42(1) of the UNCITRAL Rules.[61] In addition, Claimant claims pre-award and post-award interest as "[t]he power to award interest is an inherent element of a tribunal's adjudicatory and remedial authority and is implicitly contained within the terms of agreements to arbitrate."[62] Consistent with the statutory pre-judgment interest rate in Washington, D.C., Claimant requests simple interest at the rate of 6% per annum.

   *ii.    Relief Sought*

68. Claimant requests issuance of an award from this Tribunal:

   a.    Finding that the Republic breached the Engagement Letter and awarding Claimant the amount of $1,178,933.23 for Hogan Lovells' legal fees and costs and the amount of $48,412.87 for AKS's legal fees and costs;

   b.    Finding that the Emirate, as the successor in interest to the Republic, breached the Engagement Letter and awarding Claimant the amount of $1,178,933.23 for Hogan Lovells' legal fees and costs and the amount of $48,412.87 for AKS's legal fees and costs;

   c.    Finding that the Republic was unjustly enriched by failing to pay for AKS's legal services and awarding Claimant the amount of $48,412.87 for AKS's legal fees and costs;

   d.    Finding that the Emirate, as successor in interest to the Republic, was unjustly enriched by failing to pay for AKS's legal services and awarding Claimant the amount of $48,412.87 for AKS's legal fees and costs;

---

[59] Witness Statement of Dennis Tracey, ¶ 12; C-20, Afghan Knowledge Solution invoices to Hogan Lovells, dated February 28, 2021 through June 30, 2021.

[60] Hearing Transcript Day 2, 134:12-13, 139:5-9; CLA-17.

[61] Claimant's Submission on Costs and Interest dated November 29, 2022, ¶¶ 3-13.

[62] Claimant's Submission on Costs and Interest dated November 29, 2022, ¶¶ 14-17; CLA-19.

 e. Awarding Claimant pre and post judgment interest;

 f. Ordering Respondent to pay Claimant's costs of this arbitration, including its attorneys' fees; and

 g. Granting such other and further relief as the Sole Arbitrator deems appropriate.[63]

## VII. THE TRIBUNAL'S ANALYSIS

69. In the following, the Tribunal will analyze Claimant's arguments in support of its claims and decide on Claimant's claims.

   *i.* *Jurisdiction*

70. This Tribunal has jurisdiction to rule upon Claimant's claim and the Tribunal holds that it has jurisdiction to decide Claimant's claims against Respondent(s).

71. The Parties' arbitration agreement provides: "the UNCITRAL Arbitration Rules shall govern the arbitration."[64] Pursuant to Article 23(1) of the UNCITRAL Rules, this Tribunal is competent to rule upon its own jurisdiction ("The arbitral tribunal shall have the power to rule on its own jurisdiction…").

72. Claimant's claims are for legal fees owed for services performed under the Engagement Letter together with a claim for alleged third-party disbursements related thereto and brought against the Respondent(s), i.e. the successive governments of Afghanistan described by Claimant as the Republic and the Emirate.

73. The scope of the arbitration agreement comprises "any disputes or claims of any type or nature with respect to services rendered pursuant to this engagement letter, including, without limitation, disputes or claims related to legal fees for such services."

74. While the Engagement Letter is addressed to Afghanistan's Ministry of Finance and Ministry of Mines and Petroleum, it also sets forth that the Ministries are those of the "Government of the Islamic Republic of Afghanistan."  Both Ministries signed the Engagement Letter for "the Government of the Islamic Republic of Afghanistan."  As set forth below, the Tribunal deems the Emirate as the Republic's successor government, both

---

[63] SoC, ¶ 53.

[64] C-2.

governing Afghanistan.[65]  This Tribunal thus has jurisdiction over the Respondent(s) and the claims brought by Claimant.

    *ii.*   *Sovereign Immunity*

75. Since the Parties did not choose the law applicable to their Engagement Letter, the Tribunal is guided by Article 35 of the UNCITRAL Rules, which provides:

> 1. The arbitral tribunal shall apply the rules of law designated by the parties as applicable to the substance of the dispute. Failing such designation by the parties, the arbitral tribunal shall apply the law which it determines to be appropriate.
> 2. […]
> 3. In all cases, the arbitral tribunal shall decide in accordance with the terms of the contract, if any, and shall take into account any usage of trade applicable to the transaction.

76. In the Commentary to the 2013 UNCITRAL Arbitration Rules, the Working Group concluded that the provision of Article 35(1) was drafted in sufficiently broad terms, and it was understood that the tribunal might apply different laws, depending on the issues at stake in the dispute.[66]

77. Respondent(s) cannot invoke a defense of sovereign immunity because the activities at issue fall under the commercial exception and the arbitration exception under both the Foreign Sovereign Immunities Act as well as the UN Convention on Jurisdictional Immunities of States and Their Property.

    (1)    FSIA

78. States lose their immunity under the commercial activity exception in suits that are based upon (1) "a commercial activity carried on in the United States by a foreign state"; (2) "an act performed in the United States in connection with a commercial activity of the foreign state elsewhere"; or (3) "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in

---

[65] See infra, ¶¶ 96 et seq.

[66] See D Caron, L. Caplan, The UNCITRAL ARBITRATION RULES, A Commentary, 2nd ed (OUP 2013), at p. 119; UNCITRAL 43rd session, UN Doc A/CN. 9/684, n. 46, ¶ 96.

the United States."[67]  This requires that the activity in question be "commercial" and that the action giving rise to the suit be "based upon" that commercial activity.  The FSIA defines "commercial activity" as either "a regular course of commercial conduct" or "a particular commercial transaction or act," but it also provides that the nature of the activity, rather than its purpose, must be taken into consideration.[68]  In other words, regardless of the foreign state's motive, it needs to be determined whether the conduct at issue is the type of conduct that private players in the market typically engage in.[69]

79.  When assessing whether the claimant's claim is "based upon" the commercial activity or upon an act performed in connection with that activity, the US Supreme Court requires that the core, or "gravamen," of the claimant's complaint be "based upon" the alleged commercial activity.[70]

80.  It is also necessary to assess whether there is a "jurisdictional nexus".  Namely, whether the commercial activity upon which the claimant's suit is based is sufficiently connected to the United States. The FSIA sets forth that the jurisdictional nexus is sufficient if the commercial activity was "carried on" in the US and requires a "substantial contact" between that activity and the US.

81.  US courts have recognized that a foreign state waives its immunity implicitly when it agrees to arbitrate in the United States.[71]  A petitioner need only make prima facie showing that there is an arbitration agreement by producing a treaty or other international agreement and the notice of arbitration.[72]

---

[67] CLA-02, 28 U.S.C. § 1605(a)(2).

[68] CLA-02, 28 U.S.C. § 1603(d).

[69] See *Saudi Arabia v. Nelson*, 507 U.S. 349, 359 (1993).

[70] See *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993).

[71] See *Jacubovich v. State of Israel*, 816 F. App'x 505, 508 (2d Cir. 2020); *Barapind v. Gov't of Republic of India*, 844 F.3d 824, 829 (9th Cir. 2016); Federal Judicial Center, The Foreign Sovereign Immunities Act: A Guide for Judges 49 (2d ed. 2018); 1 Restatement (Fourth) of Foreign Relations Law § 453, Reporter's Note 1, at 346 (2018).

[72] *Energoalians SARL v. Republic of Moldova*, UNCITRAL, Memorandum Opinion of the US District Court for the District of Columbia, 23 August 2019, ¶ 19.

(2)     International Law

82. Under international law, sovereign immunity is governed by customary international law.[73] As a customary international law source, Article 10 of the United Nations Convention on Jurisdictional Immunities of States and Their Property (the "**UN Immunities Convention**") provides that if a State engages in a commercial transaction with a foreign natural or juridical person and, by virtue of the applicable rules of private international law, differences relating to the commercial transaction fall within the jurisdiction of a court of another State, the State cannot invoke immunity from that jurisdiction in a proceeding arising out of that commercial transaction.[74]

83. The UN Immunities Convention defines 'commercial transaction' as "any commercial contract or transaction for the sale of goods or supply of services."[75]

84. Similar to the FSIA, the UN Immunities Convention also provides an arbitration exception. In Article 17 of the Convention, it is provided that "if a State enters into an agreement in writing with a foreign natural or juridical person to submit to arbitration differences relating to a commercial transaction, that State cannot invoke immunity from jurisdiction before a court of another State which is otherwise competent in a proceeding which relates to: (a) the validity, interpretation or application of the arbitration agreement; (b) the arbitration procedure; or (c) the confirmation or the setting aside of the award, unless the arbitration agreement otherwise provides.[76]

(3)     Analysis

85. It is undisputed that the Engagement Letter is for the supply of legal services and as such, to be deemed a commercial contract. In addition, it is undisputed that while not exclusively, Claimant rendered legal services through its Washington D.C. and New York offices to Afghanistan. The damages directly arise out of claims for legal fees for services rendered under the Engagement Letter. Contracts between foreign governments and U.S.-

---

[73] *Anatolie Stati and others v. Republic of Kazakhstan*, SCC Case No. V116/2010, Decision of Svea Court of Appeal (Svea Hovrätt) II, 17 June 2020 [Unofficial English], ¶¶ 16, 17.

[74] CLA-07, United Nations Convention on Jurisdictional Immunities of States and Their Property, Article 10.

[75] CLA-07, United Nations Convention on Jurisdictional Immunities of States and Their Property, Article 2(1)(c)(i).

[76] CLA-07, United Nations Convention on Jurisdictional Immunities of States and Their Property, Article 17.

based law firms for "the provision of legal services constitute commercial activity", especially "when the claim against the foreign state arose from the state's failure to pay legal fees."[77]  Claimant's claims qualify under the commercial transaction exception under both the FSIA and the UN Immunities Convention.

86. In addition, based on the above cited arbitration agreement contained in Article 14 of the Engagement Letter's General Terms of Representation, Respondent(s) cannot claim sovereign immunity from the arbitration proceedings at hand.[78]

### iii.    The Republic's Breach of Contract

#### (1)    Claimant's legal fees

87. Deciding in accordance with the terms of the contract as guided by Article 35(1) of the UNCITRAL Rules, whether under New York or Washington, D.C. laws, the Republic breached the Engagement Letter by failing to pay $1,178,933.23 for legal services rendered by Claimant.

88. The elements of a breach of contract claim are well established: (1) the existence of a valid and enforceable contract between the parties; (2) performance of obligations as required by the contract by the party bringing the claim; (3) a breach of the contract by the adversary; and (4) damages suffered by the party brining the claim as a direct result of the adversary's breach of contract.[79]

89. With respect to Claimant's legal fees claimed, the Tribunal agrees with Claimant's closing argument in that this is a straightforward breach of contract case.  As stated by counsel for the Claimant: "The contract is clear, it's in writing, it's signed by both parties.  It's unambiguous …. And I think the testimony of Mr. Isakhel confirmed in all respects that Hogan Lovells performed its services properly in accordance with its professional requirements and in accordance with the engagement agreement.  He also confirmed that the billings were proper and in accordance with the engagement agreement, after having

---

[77] CLA-05, *Dentons U.S. LLP v. The Republic of Guinea*, 134 F. Supp. 3d 5, 9 (D.D.C. 2015).

[78] See supra, at ¶¶ 11, 70-74.

[79] See CLA-12, *United States Conference of Mayors v. Great-West Life & Annuity Insurance Co.*, 327 F. Supp. 3d 125, 129 (D.D.C. 2018); CLA-13, *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2nd Cir. 2011).

reviewed each of the bills that were submitted to the tribunal.  And he also confirmed that there was no reason not to pay the bills, that they were not paid as a result of bureaucratic delays.  That he, as the representative of the government, intended to pay the bills and believed they were properly due and was in fact embarrassed that they were not paid."[80]

90. The government of Afghanistan, then acting as the Republic, breached the Engagement Letter and Claimant suffered damages of $1,178,933.23 therefrom.

(2)    Claimant's disbursements

91. However, the Tribunal disagrees with the Claimant with respect to its claim for $48,412.87.  While the AKS legal fees are to be qualified as "major third-party charges" within the meaning of Article 7 of the Engagement Letter's General Terms of Representation ("…If major third-party charges are incurred in connection with the representation, such as printing bills, filing fees, court reporting fees, and consultant or expert witness fees, our normal practice is to forward such statements directly to you for payment…"),[81] AKS's invoices were not forwarded to Afghanistan prior to this Arbitration, Claimant has neither incurred such charges at this time, nor has AKS pursued any action against Claimant to that effect.[82]  Indeed, Article 4 of the Cooperation Agreement provides that "invoices submitted by [AKS] ... will be paid by HL from funds received from the relevant HL client under the Engagement Letter ... and that HL is not independently guaranteeing payment of such invoices nor is it responsible for its payment until HL receives payment of amounts invoiced by AKS from its client."  Article 4 of the Cooperation Agreement thus shields Claimant from liability in that respect at this point in time.[83]

92. Claimant's breach of contract claim for payment of $48,412.87 from Respondent(s) is denied.

---

[80] Hearing Transcript Day 2, 130:13 – 131-17.

[81] Hearing Transcript Day 1, 120:9 – 121-14.

[82] C-02, Hogan Lovells Engagement Letter, signed January 2019; SoC, ¶ 47.

[83] C-19, Cooperation Agreement between Hogan Lovells and Afghan Knowledge Solutions, dated January 5, 2021.

        *iv.*    *Unjust Enrichment*

93. Claimant cannot recover for the $48,412.87 under an unjust enrichment theory either. The elements of an unjust enrichment claim under Washington, D.C. and New York laws are well established.[84] But the existence of a contract bars an unjust enrichment claim, unless there is a basis to set aside a contract as unenforceable.[85] Claimant invoked a breach of the Parties' contract, the Engagement Letter for damages. No claim for the Engagement Letter's unenforceability has been made in this Arbitration.

94. The outcome is no different under international law. As a general principle of international law, unjust enrichment provides a party with the right of restitution of anything of value that has been taken or received by the other party without a legal justification.[86] But a finding of an unjust enrichment also requires the existence of the following elements, as developed in, among other, the *Sea-Land* case: (1) one party has to be enriched at the expense of the other as a consequence of the same act or event; (2) there must be no justification for the enrichment; and (3) there must be no contractual or other available remedy to the injured party whereby the injured party might seek compensation from the party enriched. Similarly as under Washington D.C. or New York laws, the Parties' Engagement Letter prevents Claimant's access to an unjust enrichment claim under international law as well.

95. Claimant's unjust enrichment claim for payment of $48,412.87 from Respondent(s) is denied.

---

[84] See CLA-14, *Falconi Sachs v. LPF Senate Square, LLC* 22 A.3d 550, 556 (D.C. Cir. 2016) ("(1) Claimant conferred a benefit on Respondent; (2) Respondent retained the benefit; and (3) under the circumstances, Respondent's retention of the benefit is unjust."); CLA-15, *Georgia Malone & Co. v. Ralph Rieder*, 86 A.D.3d 406, 408 (2s Dept. 2011) ("the other party was enriched, at plaintiff's expense, and that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.").

[85] See, e.g. Restatement (Third) of Restitution and Unjust Enrichment § 2. Cmt. c. See also CLA-14.

[86] See *Saluka Investments BV (The Netherlands) v. Czech Republic*, PCA Case No. 2001-04, Partial Award, 17 March 2006, ¶ 449. See also, *Sea-Land Service, Inc. v. The Government of the Islamic Republic of Iran*, Ports and Shipping Organization, IUSCT Case No. 33, ¶ 61, providing the following definition for the unjust enrichment: "There must have been an enrichment of one party to the detriment of the other, and both must arise as a consequence of the same act or event. There must be no justification for the enrichment, and no contractual or other remedy available to the injured party whereby he might seek compensation from the party enriched."

*v.*     *The Emirate's Liability for the Republic's Breach of Contract*

96. With respect to the Emirate's liability for the Republic's breach of contract, the Tribunal finds international law to be most appropriate under Article 35(1) of the UNCITRAL Rules.  For the reasons laid out below, the Emirate is liable for the Republic's breach of contract.

97. As a generally accepted principle of international law, a change of government does not in and of itself amount to the creation of a new State; state succession issues simply do not arise in such situations, and the new government is bound by all international obligations of its predecessor government.[87]  This remains the case even when it arises as a result of a revolution or a coup d'État.[88]

98. A classic example is that of France, which had radically changed regimes many times over the course of the past three centuries.[89]  Another example is that of the 1979 Revolution in Iran which, albeit it had radical effects on all levels of Iranian society, did not alter Iran's continuous international legal personality as a State.[90]  Similarly, the 1917 Revolution in

---

[87] B. Stern, La succession d'États (Volume 262), in: Collected Courses of the Hague Academy of International Law (1996), p. 71; J. Crawford, The Creation of States in International Law, 2nd ed (OUP, 2006), p. 678; J. L. Kunz, Identity of States under International Law, (1955) 49 AJIL Kunz, p. 73; International Law Association (ILA), Rapport Préliminaire: succession d'États en matière de traités, Committee on Aspects of the Law of State Succession, 1996, p. 658; J. B. Moore, Digest of International Law, Vol I (GPO 1906), p. 249; K. Marek, Identity and Continuity of States in Public International Law (Librairie Droz, 1968 - Albanie, Droit international public), 24. ff; W. Czaplinski, La continuité, l'identité et la succession d'États: évaluation de cas récents, (1993) 26 R.B.D.I., p. 378; W. Fiedler, "Continuity", in R. Bernhardt (ed), Encyclopaedia of Public International Law, Vol 1 (North Holland 1984), p. 807; E. J. Castren, Aspects récents de la succession d'Etats, Vol. 78 (1951-I), p. 395; C. Rousseau, Droit international public (Sirey, 1953), p. 264; V. D. Degan, Création et disparition de l'État (à la lumière du démembrement de trois fédérations multiethniques en Europe), Vol. 297 (1999); C.J. Tams, 'State Succession to Investment Treaties: Mapping the Issues' (2016) 31(2) ICSID Rev. 315, p. 319-320; see also CLA-17, Restatement (Third) of Foreign Relations, Sections 208 through 210.

[88] Kunz, at p. 73; Czaplinski, at p. 378; Marek, at p. 25.

[89] Sir Robert Jenning and Sir Arthur Watts, Oppenheim's International Law, vol I 9th edn (Longman 1996) 204–5: The continuity of a State as an international person notwithstanding changes of the kind mentioned may be illustrated by the history of France, which has over the centuries retained its identity although it acquired, lost and regained parts of its territory, changed its dynasty, was a kingdom, a republic, an empire, again a kingdom, again a republic, again an empire, and is now once more a republic. All its international rights and duties as an international person continued in spite of these important changes. Even such loss of territory as occasions the reduction of a major power to a lesser status does not affect the state as an international person.

[90] *The United States of America v. The Islamic Republic of Iran*, Award, IUSCT Case No. B36 (574-B36–2), 3 December 1996 [53]–[54]: "Iran does not assert that its situation is one of State succession. It does not deny that it is subject to rights and liable to obligations of the former regime, as shown by the fact that it has brought to this Tribunal numerous claims arising between the former regime and the United States (…). Iran argues, however, that the debt based on the 1948 Contract was a debt personal to the former regime that should be considered non-transferable by

Russia was considered as a mere change in government rather than the creation of a new State.[91]

99. Claimant differentiates between the succession of State as opposed to the succession of government, arguing that "the change in government in Afghanistan in August 2021 is not a case of succession of state but rather of succession of government. It is only its form of government that has changed. Thus the transfer of power from the Republic to the Emirate is a succession of government and, as such, the Emirate is liable for the Republic's duties and obligations."[92]

100. On closing argument, Claimant submitted: "Courts and arbitral tribunals have long recognized the general principle of international law that state obligations survive a change in government."[93]   And Claimant continued: "arbitral tribunals have been virtually unanimous in holding that a state is not responsible for damages caused by an unsuccessful

---

analogy and that this position is supported by the principle of non-transferability of odious debts, which it asserts also is recognized in the field of State succession. The Tribunal does not take any stance in the doctrinal debate on the concept of 'odious debts' in international law. In any event, the Tribunal will limit itself to stating that the said concept belongs to the realm of the law of State succession. That law does not find application to the events in Iran. The revolutionary changes in Iran fall under the heading of State continuity, not State succession. This statement does not exclude a realist approach that recognizes that in practice the border between the concepts of continuity and succession is not always rigid. However, without denying the legal complexities which characterize the revolutionary and post-revolutionary situation in Iran or, for that matter, in some other countries, it has to be emphasized that in this Case we do not deal with an instance of State succession. In spite of the change in head of State and the system of government in 1979, Iran remained the same subject of international law as before the Islamic Revolution. For when a Government is removed through a revolution, the State, as an international person, remains unchanged and the new government generally assumes all the previous international rights and obligations of the State."

[91] Statement of Claim, para. 37. Amid nondemocratic changes of governments, U.S. courts have held subsequent governments liable for the contractual obligations of previous governments. See CLA-08, *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 731 F. Supp. 619, 620 (S.D.N.Y. 1990) regarding the "Republic of Sudan", the succeeding government, being liable for the contractual obligations of "Sudan", the former government holding unconstitutional changes in government, including coup d'états and revolutions, and changes of the name of the state all constitute a change in government, and the successor government is still bound by the prior government's contractual obligations. See also, CLA-9, *U.S. v. National City Bank of New York*, 90 F. Supp. 448, 452 (S.D.N.Y. 1950) holding "[t]he question is whether National City Bank may set off these Russian obligations against Soviet Russia's claim to the deposit account, asserted by its assignee, the United States. I begin with the acceptance of the plaintiff's major premise: that by virtue of the recognition of the Soviet regime in 1933, the validity of the Soviet banking decrees must be retroactively acknowledged." See also, CLA-10, *Jackson v. People's Republic of China*, 550 F. Supp. 869, 872 (N.D. Ala. 1982) regarding an action against People's Republic of China seeking payment of bearer railroad bonds issued by Imperial Chinese Government in 1911 holding "The People's Republic of China is the successor government to the Imperial Chinese Government and, therefore, the successor to its obligations.  The People's Republic of China has made no provision for payment of the principal due on the Hukuang bonds."

[92] Statement of Claim, ¶ 36.

[93] Hearing Transcript Day 2, 139:5-9.

revolutionary movement absent a showing of negligence on the part of the state.  But if the revolutionary movement succeeds in overthrowing the government, the state will then be responsible for all the acts of the revolution from its inception.  As Umpire Pumley explained, responsibility comes because it is the same nation.  Nations do not die when there is a change in their rulers or in their forms of government.  These are but expressions of a change of national will."[94]  In addition, Claimant argued that where a de facto government[95] has assumed the reins of government, but it has not been recognized by the international community, the state is still bound.[96]

101.       Claimant concludes its analysis by stating that "the change in government in Afghanistan does not absolve the Emirate from the contractual obligations incurred by the Republic. … The fact that the change in government involved violence or military action, and the fact that the form of government has changed from a democracy to a theocracy, does not change this analysis. The Emirate is the successor in interest of the Republic and is responsible for its contractual obligations and debts."[97]

102.       The Tribunal agrees.  Claimant's evidence presented at the hearing offered a unique opportunity to hear from witnesses who have lived through the change of government in the state of Afghanistan in August 2021.  Those witnesses include the former Chief Legal Advisor of then President of the Republic, Mohammad Ashraf Ghani, as well as Mr. Tracey, then legal counsel to Afghanistan in various legal proceedings.  In addition, the Tribunal has taken note of contemporaneous written evidence, including from non-interested third parties in this Arbitration that conclusively establish that Afghanistan underwent a change in government and that the Emirate is the name the currently acting government in Afghanistan gave the state of Afghanistan, the same state that has long been

---

[94] Hearing Transcript Day 2, 139:18 – 140:11.

[95] De facto governments are unrecognized but have effective control over some or all of a State's territory.  CLA-16, D. Morris, Revolutionary Movements and De Facto Governments – Implications of the 'Arab Spring' for International Investors, Arbitration International 28(4) pp. 721, 726.

[96] A State does not lose its international personality, or its concomitant international responsibility, simply because another State has failed to recognize a new head of State or government.  See H. Lauterpacht, Recognition of Governments; I, 45 Colum. L. Rev. 815, 821 (1945), cited in CLA-16.

[97] Statement of Claim, ¶ 38.

recognized as a member of the United Nations bordering the countries of Iran, Turkmenistan, Uzbekistan, Tajikistan, China and Pakistan.

103.    The Tribunal especially bases its decision on the fact that on August 14, 2021, the then Chief Legal Advisor to the President of Afghanistan fled the country and at least two parties suing ministries of Afghanistan at that point, quickly characterized the events unfolding in Kabul as a change of government.  Lastly, acting legal counsel for the Republic, the Claimant, was equally quick to use the terms "change of government" in its correspondence with the sitting tribunals as well as the Republic's adversary in those proceedings.

104.    Consequently, the new government of Afghanistan, the Emirate, is liable for the damages resulting from the Republic's breach of contract as well.

   *vi.    Pre- and Post-Award Interest*

105.    Neither the Engagement Letter, nor the UNCITRAL Rules address interest. However, it is commonly recognized that arbitrators sitting under the UNCITRAL Rules are afforded discretion to award pre-award and post-award interest.[98]  The Tribunal also has full discretion to determine the amount of interest to award, *i.e.* what rate, if any, to apply to an award of pre-award interest, as well as authority to determine a reasonable date from which any award of pre-award interest begins to accrue.[99]

106.    Claimant requests interests at the rate of 6% per annum, which is the statutory pre-judgment rate in Washington, D.C.[100]

---

[98] CLA-19, Chapter 23: Form and Contents of International Arbitration Awards, in International Commercial Arbitration (Gary Born ed., 2021), 3259-3369 ("The power to award interest is an inherent element of a tribunal's adjudicatory and remedial authority and is implicitly contained within the terms of agreements to arbitrate, at least absent contrary indications by the parties … even absent express authorization in institutional rules, the parties' implied agreement ordinarily includes an implied grant of power to award interest."); *CME v. The Czech Republic*, Final Award, March 14, 2003, at pgs. 154 et seq., available at https://www.italaw.com/sites/default/files/case-documents/ita0180.pdf.  See generally, New York City Bar Committee on International Commercial Disputes Report "Awards of Interest in International Commercial Arbitration", June 21, 2017.

[99] CLA-20, Janelle La Chuisa, Chapter 20: Awarding Interest in International Arbitration, in International Arbitration in the United States (L. Shore, T.H. Cheng, et al. eds., 2017), 455, 456, 462.

[100] CLA-21, D.C. Code § 28-3302(a).

107.    In exercising the discretion afforded as an inherent element of a tribunal's adjudicatory and remedial authority, the Tribunal determines that in this matter the statutory pre-judgment rate at the place of arbitration, Washington, D.C. is fair and just.

108.    Claimant shall be entitled to simple interest at 6% per annum on $1,178,933.23 since the day after the November 30, 2021 Notice of Arbitration, i.e. from December 1, 2021.

109.    Simple interest at 6% per annum on the full damages of $1,178,933.23 plus the pre-award interest accrued as of the date of the award, a total combined amount of $1,253,738.97, shall continue to accrue post-award simple interest at 6% per annum until satisfaction of the award, i.e. daily interest of $206.09.

110.    In addition, the Tribunal finds that Claimant is entitled to simple interest at 6% per annum on the costs awarded here below, i.e. a daily amount of $82.53 starting from the day after the award.

>   *vii.    Costs*

111.    Pursuant to Article 40(1) of the UNCITRAL Rules, the arbitral tribunal shall fix the costs of arbitration in its award.

112.    On November 29, 2022 and updated on December 20, 2022, the Claimant submitted its table of costs amounting to $502,058.86, comprised of $239,103.86 in legal and other costs incurred by Claimant in relation to the arbitration per Article 40(2)(e) of the UNCITRAL Rules, $17,955.00 incurred by the Claimant in relation to other expenses of witnesses (Article 40(2)(d) of the UNCITRAL Rules), and $245,000 paid in deposits for the Tribunal's fees and costs, also substituting for Respondent(s)' half. With reference to Article 43(5) of the UNCITRAL Rules, Claimant thus advanced all of the fees and expenses of the Tribunal, a total of $240,529.66 in fees and $4,470.34 in costs.

113.    All of the costs of arbitration incurred by the Claimant are reasonable and approved. Discharging its mandate under Article 40(1) of the UNCITRAL Rules, the total arbitration costs are fixed at $502,058.86, of which Claimant has paid $502,058.86.

114.    Per Article 42(1) of the UNCITRAL Rules, the costs of arbitration shall in principle be borne by the unsuccessful party. Claimant was overall successful. The weight

attributable to the AKS invoices part of Claimant's case, when compared to the remainder of Claimant's case, was de minimis. Upon Claimant's proper proof of having incurred the total costs of arbitration, Claimant is entitled to reimbursement of $502,058.86 from Respondent(s).[101]

## VIII.  THE TRIBUNAL'S DECISION AND RELIEF AWARDED

WHEREFORE, for the reasons set forth above, the undersigned arbitrator AWARDS, as follows:

1)      The Islamic Republic of Afghanistan and The Islamic Emirate of Afghanistan are ordered to pay to the Claimant damages in the amount of $1,178,933.23 plus $74,805.74 in accrued pre-award interest calculated at 6% simple interest per annum since December 1, 2021, i.e. a total of $1,253,738.97 together with additional post-award interest until satisfaction of the award thereon at 6% simple interest per annum starting on the day after the issuance of this Final Award, i.e. a daily amount of $206.09.

2)      The Islamic Republic of Afghanistan and The Islamic Emirate of Afghanistan are further ordered to pay Claimant costs of arbitration incurred in the amount of $502,058.86 together with additional post-award interest thereon at 6% simple interest per annum starting on the day after the issuance of this Final Award, i.e. a daily amount of $82.53.

3)      All other claims are hereby denied.

I hereby certify that this Final Award was made in Washington D.C., USA.

Dated: December 22, 2022

Martin F. Gusy
Sole Arbitrator

[101] See also Article 42(2) of the UNCITRAL Rules.